**KLESTADT WINTERS JURELLER**
**SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Sean C. Southard
Fred Stevens
Lauren C. Kiss
Andrew C. Brown

*Proposed Counsel to the Debtor and Debtor-*
*in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re                                                        :
                                                             :    Chapter 11
CHURCH OF THE IMMACULATE HEART OF          :
MARY,                                                        :
                                                             :    Case No. 25-23180 (MG)
                                        Debtor.              :
-----------------------------------------------------------------x

### DECLARATION OF THERESA NICHOLSON, TRUSTEE OF THE DEBTOR, PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2 IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

Theresa Nicholson, being duly sworn, declares and states, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a Trustee of the Board Trustees of the Church of the Immaculate Heart of Mary (the "Debtor" or "Parish"), which filed a voluntary chapter 11 petition on December 8, 2025 (the "Petition Date") commencing this case (the "Bankruptcy Case").

2.      I submit this declaration (the "Declaration")[1] in accordance with Rule 1007-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of

---

[1] Capitalized terms used but not immediately defined shall have the meanings ascribed to them elsewhere in the Declaration.

New York (the "Local Rules") and in connection with the Debtor's voluntary petition (the "Petition") for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on the Petition Date.

3.      I make this Declaration in support of the Parish's Petition, to provide the Court and all parties in interest with an overview of the Parish and the events precipitating the commencement of the Bankruptcy Case, and in support of certain immediate relief being sought by the Parish, as further set forth herein.

4.      Except as otherwise indicated herein, the facts set forth in this Declaration are based on my personal knowledge, my review of relevant documents, information provided to me by the Parish's management, employees or professionals, or my opinion based upon my experience, knowledge, and information concerning the Parish's financial affairs.  If called upon to testify, I would testify competently to the facts set forth in this Declaration and that I am authorized to submit this Declaration on behalf of the Parish.

5.      I have served as Trustee of the Parish since March 2021.  I received a Bachelor's Degree in accounting and business economics from SUNY Oneonta.  I have over thirty-five (35) years of financial experience and I am currently a substitute teacher at the Immaculate Heart of Mary School.  I previously served as Chief Financial Officer of the Westchester Visiting Nurse Services Group, Inc. where I oversaw the business and financial divisions of the company.  Before my role at the Westchester Visiting Nurse Services Group, Inc., I worked for various companies and organizations, including Andrus on Hudson, The Lutheran Care Network, Wartburg Home, Somers Manor Nursing Home, North General Hospital, and Phelps Memorial Hospital as Director of Finance or Controller.

6.      On the Petition Date, the Parish caused its attorneys to file a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  The Parish commenced the Bankruptcy Case to reorganize under Chapter 11 of the Bankruptcy Code.  I have reviewed the Petition and all documents filed in connection therewith, and I am generally familiar with the facts alleged and relief requested therein.

7.      There is no other or prior bankruptcy case filed by or against the Parish.  To the best of my knowledge, no committee of unsecured creditors has been organized prior to the entry of the order for relief in the Bankruptcy Case.  It is anticipated that the United States Trustee (the "UST") will schedule an organizational meeting soon after the Petition Date and may form an official committee of unsecured creditors (a "Creditors' Committee") at that time.

8.      A copy of the resolutions authorizing the Parish to commence the Bankruptcy Case is attached to the Petition and incorporated by reference herein.  Unless otherwise indicated, all financial information contained herein is presented on an estimated and unaudited basis.

**I.      The Debtor's Organization**

9.      In 1912, thirty-nine Catholic families from Scarsdale petitioned the Archbishop of the Archdiocese of New York ("ADNY") to establish a new parish in their village.  Their request was granted, and the Parish was incorporated under the New York Religious Corporation Law on August 5, 1913, with its own corporate structure and governance, distinct from the ADNY and from other ADNY-affiliated parishes and schools within ADNY's territory. Under the Religious Corporation Law, the Parish is governed by five trustees, consisting of two lay trustees, the rector of the Parish, the vicar-general of the ADNY, and the archbishop of the ADNY.

10.     The Parish's principal place of worship has been located in Scarsdale, Westchester County (the "Church Operations"), since its foundation.  For more than a century, the Parish has

3

served its community, and today more than 1,680 families are registered. The Parish also operates the Immaculate Heart of Mary School, founded on December 11, 1927 (the "School Operations"). In 1972, it became the first lay-administered and lay-staffed school within ADNY's territory. The school currently enrolls approximately 300 students in grades pre-k through eighth grade. The Parish is also active in a range of social ministries, including "Midnight Runs" into Manhattan to provide food and clothing to the homeless, a food pantry, and a "Bread Table" program through which parishioners sell baked goods to support hunger-relief initiatives, among other charitable efforts.

11.     The Parish is served by two (2) priests and religious staff. Father Stephen Ries has served as the pastor (the "Pastor") of the Parish since August, 2025. A finance council and a parish council function as consultative bodies that advise and assist the Pastor in matters affecting the life of the Parish. Their responsibilities include promoting lay participation, assessing the Debtor's needs and goals, recommending related strategies, and maintaining communication between parish leadership and the broader parish community.

12.     The Parish plays a central role in the lives of its parishioners by administering key aspects of their faith, including baptism, education, communication, mass, confirmation, marriage, bereavement, last rites and funeral services.

13.     The following is the stated mission ("Mission") of the Parish:

We the parish community of the Immaculate Heart of Mary aim daily to reflect upon and imitate the authentic discipleship of the Blessed Virgin Mary, especially hearing the Word of God and observing it. Through the celebration of the Eucharist, the Holy Sacraments and our efforts to meet the spiritual and physical needs and challenges of our community and beyond, we strive to imitate the unconditional love of Christ Jesus who came, not to be served, but to serve others.

II.     **The Structure of the Catholic Church and ADNY**

14.     The Roman Catholic Church is a worldwide community with over 1.2 billion members who adhere to a common creed.  The Catholic Church is the one, holy, catholic and apostolic church of Catholic belief, seated in the Vatican and headed by Pope Leo XIV (the "Catholic Church").

15.     The *Code of Canon Law* establishes the internal organizational structure and procedures to be followed within the Catholic Church.  Canon Law was originally codified in 1917 and amended by Pope John Paul II on January 25, 1983.  *See*, 1983 Code of Canon Law c.1-1752 (1983) ("Canon Law").  Canon Law also identifies property rights and agency relationships among the various structures within the community of the Catholic Church.

16.     The Catholic Church is organized by territorial districts, the most common of which is a diocese.  A diocese is usually defined by a geographic area and is created to serve the community of Latin Rite Catholics present in that area.  The Pope appoints the bishop of each diocese.  A parish is a community of the Christian faithful, stably constituted in a particular place of worship, whose pastoral care is entrusted to a priest as its proper pastor under the authority of the diocesan bishop.

17.     The ADNY is a nonprofit religious corporation incorporated in 1981 pursuant to the laws of the State of New York and is under the ecclesiastical guidance of the Catholic Church, encompassing the counties of New York, the Bronx, Staten Island, and the counties of Dutchess, Orange, Putnam, Rockland, Sullivan, Ulster, and Westchester to the north of the city, where the Parish is located.  It is the second-largest diocese in the United States by population, comprising approximately 274 parishes and serving roughly 2.8 million Catholics, as well as hundreds of Catholic schools and charitable institutions.

18.     ADNY serves as the ecclesiastical and pastoral authority for the Parish and for other parishes, schools, charitable organizations, and affiliated Catholic institutions within its territory, and it provides aid and support to these affiliated entities.  Although ADNY offers pastoral and administrative assistance, each of these organizations within its territory is a separate religious or not-for-profit corporation with its own property, finances, and governance structure.  Parishes and other affiliated entities remain independent from ADNY and are, therefore, independently responsible for their own debts and obligations.

## III.   Circumstances Leading the Debtor to File the Bankruptcy Case

### A.   The Tort Cases

19.     On February 14, 2019, the State of New York enacted the New York Child Victim's Act, which was codified in the New York Civil Practice Law & Rules 214-g (the "CVA").  The CVA created a one-year window, from August 14, 2019 to August 13, 2020, for the revival of previously time-barred civil claims related to childhood sexual abuse; that window was subsequently extended for an additional year through August 13, 2021.  Soon thereafter, New York passed the Adult Survivors Act of 2022 ("ASA"), which similarly opened a "revival window" for adult survivors of sexual abuse to file otherwise time-barred claims.  Following the implementation of these statutes, approximately 1,700 tort-abuse cases were filed by claimants (collectively the "Tort Claimants") against the Parish, ADNY, and affiliated entities.

20.     Prior to the enactment of the CVA and ASA, in 2016, ADNY instituted the Independent Reconciliation and Compensation Program ("IRCP"), as part of its efforts to bring healing and provide compensation to victims.  Through the IRCP, which concluded 2017, ADNY resolved claims by approximately 403 individuals, making more than $75 million in total payments.

21.     Upon conclusion of the IRCP and other settlement efforts, the Parish, ADNY, and related non-debtor Catholic entities remain defendants in approximately 1,300 lawsuits, of which nine are the Tort Cases against the Parish and ADNY as co-defendants and are now the subject of this Bankruptcy Case.

22.     The Tort Cases center on allegations by the claimants (the "CVA Claimants") that the Parish as well as ADNY are liable for the conduct of certain individuals based on their alleged actions and omissions in connection with employing and/or supervising the alleged perpetrators of abuse.  The Tort Cases assert numerous causes of action including, without limitation, claims for negligence, gross negligence, and breaches of fiduciary duties.

**B.      The Debtor's Insurance Program and the Insurance Litigation**

23.     During all time periods relevant to the Tort Cases, ADNY maintained a general liability insurance program (the "Insurance Program") with Indemnity Insurance Company of North America and its successors and affiliated companies (collectively, "Chubb"), which provided insurance coverage for ADNY, the Parish and other parishes, schools, and Catholic entities within ADNY's geographic territory (the "Insurance Program Participants").

24.     During these periods, the Parish and ADNY maintained primary occurrence-based policies providing coverage for the Parish and ADNY, up to the applicable per-person and per-occurrence limits.  Toward the end of the relevant period, Chubb also provided excess policies that increased the per-occurrence limits.  Pursuant to the Insurance Program, Chubb agreed to pay all defense costs and to indemnify amounts paid in judgments or settlements, in the latter case, up to the limits of available coverage.

25.     In its capacity as the administrator of the Insurance Program, ADNY has taken the lead role in defending itself and the Parish in all Tort Cases and other similar cases, and has

7

coordinated the retention of defense counsel.  However, since 2019, Chubb has refused to pay

settlements or judgments in connection with such cases.  In 2019, ADNY filed suit against Chubb

to enforce its insurance rights and sought, among other things, a declaratory judgment confirming

that Chubb is obligated, at a minimum, to provide defense coverage to ADNY in connection with

these matters.  *See The Archdiocese of N.Y. v. Ins. Co. of N. Am., et* al., Supreme Court, New York

County, Index No. 653772/2019.   That suit was voluntarily discontinued by stipulation of all

parties, after Chubb agreed, subject to a reservation of rights, to pay defense costs for tort claims

alleging abuse during the relevant policy periods.  Notwithstanding its payment of defense costs,

Chubb has maintained that it has no duty to indemnify the Insurance Program Participants for any

liabilities related to the claims at issue, and has refused to authorize the Insurance Program

Participants to accept reasonable settlement demands.  ADNY maintains that Chubb's "wait-and-

see" strategy and refusal to settle in good faith have unjustifiably delayed the resolution of abuse

claims and prioritized the insurer's financial interests over compensation for victims.

26.     In June 2023, Chubb filed a declaratory judgment action against the Insurance

Program Participants claiming that Chubb has no duty to defend or indemnify the Insurance

Program Participants for the underlying tort claims.  *See The Archdiocese of N.Y. v. Century Indem.
Co. et al.*, Supreme Court, New York County, Index No. 652825/2023 (the "Insurance

Litigation").[2]  The Insurance Program Participants filed counterclaims for competing declaratory

judgments and seeking damages for breach of contract and other counts.  At present, the Insurance

Litigation has not yet been adjudicated or resolved.

### C.     The Restructuring Efforts and the Global Settlement Negotiations

27.     The ongoing Tort Cases pose an existential threat to the Parish's ability to continue

---

[2] Given the counterclaims asserted by the Insurance Program Participants, the parties subsequently agreed to restyle the caption to list the Insurance Program Participants as plaintiffs and Chubb as defendant.

its worship and community activities.  The Parish lacks the financial capacity to satisfy potential judgments, and if forced to remain a defendant in each of the Tort Cases, it will be unable to both compensate all victims equitably and to sustain its mission within the community it serves.

28.     In recent weeks, the Parish is aware that ADNY has met with an ad hoc group (the "Ad Hoc Group") of counsel for more than 80% of plaintiffs asserting tort claims against ADNY and related entities, including the Parish.  Following an initial meeting, the parties agreed to engage Judge Daniel P. Buckley (Ret.) as a neutral mediator for the express purpose of exploring the possibility of a global settlement of all such claims (the "Mediation Process").  While negotiations remain ongoing, the parties have discussed the contours of a global framework, consistent with structures implemented in other diocesan resolutions across the United States.  Judge Buckley has an extensive track record of mediating diocesan cases, including a successful global resolution of all tort claims affecting the Archdiocese of Los Angeles, California.  A global framework of this kind would directly benefit co-defendants of ADNY, such as the Parish.

29.     ADNY had hoped to negotiate and implement a global settlement through the Mediation Process and without judicial involvement, provided that all plaintiffs agreed to a pause of all ongoing litigation.  A litigation standstill is essential to achieving a global and uniform resolution that treats all victims fairly and prevents the proverbial "race to the courthouse" among victims to obtain judgments against the respective defendants.

30.     However, CVA Claimants – one of which is represented by counsel who has participated in the Mediation Process – have so far declined to voluntarily pause litigation and instead continue to advance their individual Tort Cases.  One Tort Case in particular, *MCVAWCR-DOE v. The Roman Catholic Archdiocese of New York, Church of Immaculate Heart of Mary, et*

*al.*,[3] (the "2020 Westchester Case"), is scheduled for trial on December 9, 2025, and the claimant has expressed a clear intent to proceed.  Litigating the Tort Cases threatens to fracture, if not entirely derail, the Mediation Process, which offers a global, coordinated, and equitable solution for all similarly situated claimants.

31.     Certain CVA Claimants pursuing continued litigation may have hoped that the burden, cost, and uncertainty of monitoring the Tort Cases, or the prospect of a favorable judgment, would pressure the Parish or ADNY into providing them with more favorable treatment than what they could equitably expect to receive through the Mediation Process.  In reality, the existential threat posed by the Tort Cases left the Parish with no viable alternative but to file this Bankruptcy Case.

**D.     Impact of Pending Subject Tort Cases on the Debtor's Restructuring Efforts**

32.     I understand that the Tort Cases cannot proceed against the Parish following the imposition of the automatic stay.  The Parish is nevertheless concerned that certain CVA Claimants may attempt to circumvent the automatic stay by severing the Parish from those actions and therefore continue prosecuting the Tort Cases solely against ADNY.  I have been told that such a course would likewise violate the automatic stay and, in any event, would have an immediate adverse economic impact on the Parish and impair its restructuring efforts.

33.     I believe that continuing the Tort Cases during the pendency of this Bankruptcy Case will be burdensome to both the Parish and ADNY and will disrupt the administration and expeditious reorganization of the Parish's estate to the detriment of all creditors.  Critically, any Tort Case successfully prosecuted against ADNY would likely result in the respective CVA Claimants seeking to satisfy a judgment through insurance proceeds shared between ADNY and

---

[3] Index No. 57393/2020, Supreme Court of the State of New York, County of Westchester (the "State Court").

the Parish. Any use of shared insurance to satisfy such a judgment would deplete—dollar for dollar—proceeds that would otherwise be available to the Parish to address its own liability for the same claims, given the finite reserves and policy limits under the Insurance Program.

34.    Allowing the CVA Claimants to proceed will also permit them to obtain an unfair advantage over all other similarly situated survivors of abuse. Inevitably, the Parish and ADNY will be required to expend significant time and money in responding to the Tort Cases, further dissipating the assets of the Parish's estate to the detriment of all creditors.[4] Moreover, litigating the Tort Cases is inconsistent with and threatens the Mediation Process, which, though led by ADNY, offers the Parish a meaningful opportunity to resolve its own tort liabilities.

## IV.    Debtor's Assets and Liabilities

### A.    Assets

35.    The Parish's primary assets consist of the real property from which the Church Operations and School Operations are conducted and cash that it collects from charitable donations.

36.    As of the Petition Date, the Parish maintained the following bank accounts[5]:

| Financial Institution | Type of Account | Last 4 Digits of Account | Balance on December 5, 2025 |
|---|---|---|---|
| Webster Bank | Checking - Operating Account | 2301 | $274,667.27 |
| Webster Bank | Checking - Renew & Rebuild Campaign (Restricted) | 6486 | $34,129.44 |
| Webster Bank | Checking - Capital Improvement (Restricted) | 1501 | $69,333.44 |
| Webster Bank | Money Market - School Reserve (Restricted) | 5788 | $47,168.28 |
| Webster Bank | Checking - Stipend (Restricted) | 6494 | $17,728.91 |

---

[4] While Chubb is providing defense costs, those payments are (1) subject to Chubb's reservation of rights and its claim for recoupment/clawback in the Insurance Litigation, and (2) constitute property of the Debtor's estate as insurance proceeds.

[5] Accounts that contain funds which the Parish treats as restricted in accordance with applicable law are denoted.

| Financial Institution | Type of Account | Last 4 Digits of Account | Balance on December 5, 2025 |
|---|---|---|---|
| Webster Bank | Money Market - John P. Naughton Scholarship Fund (Restricted) | 4641 | $5,017.20 |
| Webster Bank | Checking - CYO Sports (Restricted) | 3201 | $51,898.05 |
| Webster Bank | Checking - IHM School Operating (Restricted) | 2304 | $201,144.28 |
| Webster Bank | Checking - IHM School Tuition (Restricted) | 5501 | $517,838.09 |
| Webster Bank | Checking - IHM School Activities (Restricted) | 6601 | $44,246.53 |
| Webster Bank | Money Market - IMH – HSA (Home School Association) (Restricted) | 1140 | $5,413.13 |
| JP Morgan Chase Bank, N.A. | Certificate of Deposit | 6830 | $117,798.80 |
| JP Morgan Chase Bank, N.A. | Checking Account | 3816 | $1.00 |
| OceanFirst Bank | Checking Account - Renew and Rebuild Campaign and Auxiliary Organizations (Restricted) | 4876 | $438,773.12 |
| **TOTAL** | | | **$1,825,157.54** |

37.     The Church Operations are primarily funded by donations from parishioners and the Parish relies on this revenue to continue its Mission.

38.     The School Operations are primarily funded by tuition payments.  However, there is often an annual shortfall for School Operations, which is subsidized by the Parish from the Church Operations and/or ADNY.

**B.     Liabilities**

39.     Apart from monthly operating expenses, almost all of the Parish's liabilities consist of amounts due to ADNY on account of loans made to the Parish to subsidize Church Operations and School Operations (totaling $1,029,270.71 in the aggregate), amounts due under a line of credit with Parish Assistance Corporation (currently totaling $100,000), and litigation claims of the CVA Claimants of an undetermined value.

V.      **First Day Motions**

40.     To enable the Parish to operate effectively and minimize potential adverse effects during the pendency of the Bankruptcy Case, the Parish is requesting certain relief in "first day" motions and applications filed with the Court concurrently herewith (collectively, the "First Day Motions").[6] The First Day Motions, summarized below, seek to implement procedures that will promote a seamless transition into the Bankruptcy Case, allowing the Parish to continue its Mission and generally minimize any potential adverse effects on the Parish's operations during the reorganization process.

41.     I believe that the relief requested in each First Day Motion is necessary to preserve and maximize the value of the Debtor's estate, essential to the successful reorganization of the Debtor, and in the best interest of the Debtor's estate, CVA Claimants, creditors, and other parties in interest.

A.      **Motion for Continuation of Cash Management Systems**

42.     The Debtor has filed a motion seeking the entry of interim and final orders authorizing, but not requiring, the Debtor to: (a) continue use of its existing cash management system by, among other things, maintaining its existing Bank Accounts and credit cards, and (b) continue to use their Business Forms in the same manner in which they existed prior to the Petition Date (the "Cash Management Motion").

43.     The Debtor maintains eleven (11) bank accounts with Webster Bank, two (2) banks accounts with JP Morgan Chase Bank, N.A, and one (1) bank account with OceanFirst Bank. All of the aforementioned banks are designated as authorized depositories in the Southern District of New York.

---

[6] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the corresponding First Day Motion.

44.     In the ordinary course of business, the Debtor utilizes a multitude of check types. Additionally, the Debtor uses a variety of correspondence and business forms.  To minimize the expense to the Debtor's estate associated with developing and, or, purchasing entirely new forms, the delay in conducting business prior to obtaining such forms and the confusion of third parties, the Debtor seeks authority to continue to use all correspondence, business forms, and checks as such forms existed immediately prior to the Petition Date, without reference therein to the Debtor's status as a debtor-in-possession.  However, following the depletion of the Debtor's various correspondence, business forms, and checks, the Debtor will obtain new forms reflecting its status as a debtor-in-possession.

45.     I believe that the relief requested in the Cash Management Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate in chapter 11 without disruption.

### B.     Motion for Payment of Employee Wages and Related Compensation and Benefits

46.     The Debtor will be filing a motion seeking the entry of interim and final orders (i) authorizing, but not requiring, payment of prepetition wages and employee benefits, (ii) authorizing and directing banks to honor checks with respect thereto, and (iii) authorizing, but not requiring, payment of postpetition wages and employee benefits (the "Employee Wage Motion").

47.     The Debtor currently has forty-nine (49) employees.  Each of the Debtor's employees are engaged in either the Debtor's church-related operations or school-related operations.  To that end, the Debtor has:  (i) seven (7) full time and nine (9) part time employees that are engaged in the Debtor's church-related operations (the "Church Employees"), and (ii) twenty-four (24) full time and nine (9) part time employees that are engaged in the Debtor's school-related operations (the "School Employees", and together with the Church Employees, the

"Employees").

48.    As part of the Employee Wage Motion, the Debtor seeks entry of interim and final orders (i) authorizing, but not requiring, the Debtor to pay, in its sole discretion, approximately $60,000, inclusive of the Prepetition Wages (which the Debtor believes is approximately $50,000), Prepetition Payroll Administration Fees (totaling approximately $250), and the prepetition costs related to the Employee Benefits (totaling approximately $9,000), including the Medical Benefits Contribution.

49.    None of the amount proposed to be paid to any single Employee will exceed the $17,150 priority cap in Section 507(a)(4) of the Bankruptcy Code.

50.    To avoid the significant risks of Employees refusing to continue to work for the Debtor, discontent, or loss of morale among essential employees, and in view of the priority awarded to wage claims, it is necessary and appropriate that the Debtor be granted the requested authorization.

51.    The Debtor requires the continued services of the Employees to ensure the continuity and quality of its operations will not be threatened and so that the Debtor may continue, without unnecessary interruption, its efforts to achieve a successful reorganization.

52.    Accordingly, by the Employee Wage Motion, the Debtor seeks authority pursuant to sections 105(a) and 363(b) of the Bankruptcy Code authorizing the Debtor to pay Employee Obligations and to continue, uninterrupted, its practices, programs, and policies with respect to its Employees, as such practices, programs, and policies were in effect as of the Petition Date.

53.    I believe the relief requested in the Employee Wage Motion represents a sound exercise of the Debtor's business judgment and is necessary to avoid immediate and irreparable harm to the Debtor's estate.

54.     I understand the Debtor believes that without the relief requested in the Employee Wage Motion, Employees may seek alternative employment opportunities, which would deplete the Debtor's workforce and hinder the Debtor's ability to operate.

55.     I believe that the relief requested in the Employee Wage Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate its business in chapter 11 without disruption.

### C.     Utilities Motion

56.     The Debtor has filed a motion seeking the entry of an order (i) prohibiting the Utility Providers from discontinuing, altering, or refusing service, (ii) approving the proposed form of adequate assurance of payment to the Utility Providers, (iii) establishing procedures for resolving requests for additional adequate assurance of payment, and (iv) granting related relief (the "Utilities Motion").

57.     In the ordinary course of the Debtor's operations, the Debtor obtains water, sewer service, telecommunications, electricity, waste disposal, natural gas, and other similar services and other similar services from a number of utility providers.  A list of the Utility Providers that directly provide Utility Services to the Debtor, together with the average monthly payment for each Utility Provider, and where available, the Debtor's account number with each Utility Provider is attached to the Utilities Motion as Exhibit "B".

58.     The Debtor relies on the uninterrupted receipt of Utility Services for its operations. If a Utility Provider were to refuse or discontinue service, even for a brief period, the Debtor's Church Operations and School Operations could be disrupted.  Such a disruption could jeopardize the Debtor's efforts in this Bankruptcy Case.  Accordingly, it is essential that the Utility Services continue uninterrupted during the Bankruptcy Case.

16

59.     The Debtor estimates that approximately $9,000 of the invoices on account of prepetition Utility Services have accrued and remain payable.  The Debtor estimates that the cost for Utility Services that will need to be paid by the Debtor to the Utility Providers during the next 30 days will total approximately $25,000.

60.     The Debtor intends to pay post-petition obligations to the Utility Providers in a timely manner and in the ordinary course on a post-petition basis. The Debtor currently has sufficient funds to pay amounts described in the Utilities Motion.  To provide additional assurance of payment for Utility Services, the Debtor proposes to deposit $17,150 into a segregated account, within thirty (30) days after the Petition Date.  The amount of the Aggregate Adequate Assurance Deposit is equal to the aggregate of all Individual Utility Monthly Payment Average Amounts.

61.     I believe that the Proposed Adequate Assurance, in conjunction with the Debtor's ability to pay for future Utility Services in accordance with their prepetition practice, constitutes sufficient adequate assurance to the Utility Providers in full satisfaction of payment as required by section 366 of the Bankruptcy Code.  To the extent that any Utility Provider believes that additional assurance is required, the Adequate Assurance Procedures provide a reasonable and organized process for doing so and thereby avoiding a more haphazard and chaotic process.

62.     I believe that the relief requested in the Utilities Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest and will facilitate the Debtor's ability to operate in chapter 11 without disruption.

### D.     Motion for an Extension of Time to File Schedules and Redact Personally Identification Information

63.     The Debtor has filed a motion seeking the entry of an order (i) extending the time within which the Debtor must file its Schedules of Assets and Liabilities (the "Schedules") and Statement of Financial Affairs (the "SoFA") by 30 days, for a total of 44 days from the Petition

Date, without prejudice to the Debtor's ability to request additional extensions, and (ii) authorizing and approving special noticing and confidentiality procedures to protect the identities and personal contact information of the CVA Claimants and employees of the Debtor (the "Schedules Extension and Redaction Motion")

64.     Given the critical matters that the Debtor's management and professionals were required to address prior to the commencement of the Bankruptcy Case, the Debtor was not in a position to complete the Schedules and SoFA as of the Petition Date or within the initial time allotted under the Bankruptcy Code and Bankruptcy Rules.

65.     The Schedules, SoFA, and creditor matrix may contain the names of the CVA Claimants and the home addresses of the Debtor's Employees.  The Debtor seeks to redact and seal the (i) identities and personal contact information of the CVA Claimants, including, but not limited to, certain litigants that have commenced prepetition lawsuits against the Debtor using a Doe or other pseudonym and (ii) personal contact information of the Debtor's Employees because such information could be used, among other things, to harass, perpetrate identity theft, locate survivors of domestic violence or stalking who have otherwise taken steps to conceal their whereabouts, or otherwise inflict unlawful harm upon these individuals.

66.     The Debtor proposes to provide unredacted versions of all documents containing redactions to the Court, the UST, counsel to any official committee of unsecured creditors appointed in this Bankruptcy Case (if any), and other parties in interest upon Court order and subject to confidentiality arrangements satisfactory to counsel for the Debtor.

## VI.    **Additional Motions/Relief Sought**

67.    On or shortly after the Petition Date, the Debtor intends to file the following additional motions and applications.  The Debtor will file additional motions as necessary after the Petition Date in connection with the administration of the Bankruptcy Case.

### A.    **Adversary Proceeding Complaint**

68.    Although the CVA Claimants have not yet asked the State Court to sever the Debtor from the Tort Cases, the Debtor is concerned that they may pursue such a strategy in an effort to avoid the effects of the automatic stay and attempt to continue the trial against ADNY. Continuation of the trial solely against ADNY, however, would be equally harmful to the Debtor, as it would have significant economic consequences for the Debtor's ability to reorganize.

69.    As noted, the Debtor, ADNY and other affiliated entities are engaged in coordinated restructuring efforts through the Mediation Process, which is intended to achieve a global settlement funded by contributions from ADNY, the Debtor and other affiliates.  Allowing the Tort Cases to proceed against ADNY would risk diminishing ADNY's financial capacity to contribute to a settlement, thereby reducing the likelihood of a successful global settlement that would address the Debtor's own tort liabilities. In other words, proceeding against ADNY will consume resources that would otherwise be available for a global settlement, to the detriment of the Debtor, as well as all tort victims and parties in interest.

70.    Moreover, as set forth above, any Tort Case successfully prosecuted against ADNY would likely result in CVA Claimants seeking to satisfy a judgment through shared insurance proceeds.  Any use of shared insurance to satisfy such a judgment would deplete—dollar for dollar—proceeds that would otherwise be available to the Debtor to address its own liability for the same claims.  Given the finite reserves and policy limits under the Insurance Program, the total

insurance coverage available to ADNY and the other participating entities, including the Debtor, is limited.  Accordingly, continuation of the Tort Cases as to any Insurance Program Participant will have an immediate adverse economic effect on the Debtor's estate.

71.    Additionally, if the Tort Cases continue solely against ADNY, the Debtor will nonetheless be required to monitor and participate because the claims asserted against ADNY are the same claims asserted against the Debtor.  The Debtor may be exposed to contribution liability, collateral estoppel, adverse precedent, vicarious liability, or imputed admissions if the litigation proceeds.  In that event, the Debtor will have no choice but to participate in the Tort Cases, diverting substantial resources away from its Chapter 11 process and undermining the effectiveness of the automatic stay.

72.    The Debtor intends to pursue a restructuring that is closely coordinated with the broader resolution pursued through the Mediation Process.

73.    As such, the Debtor is commencing an adversary proceeding to stay or otherwise enjoin the continued prosecution of the Tort Cases, including the 2020 Westchester Case scheduled for trial on December 9, 2025.  In particular, the Debtor seeks a declaratory judgment, pursuant to sections 105(a) and 362(a) of the Bankruptcy Code, that the automatic stay enjoins any further prosecution of the Tort Cases at least until the effective date of a confirmed plan of reorganization for the Debtor.

74.    In the alternative, the Debtor also seeks injunctive relief pursuant to sections 105(a) and 362 of the Bankruptcy Code and Rule 7065 of the Federal Rules of Bankruptcy Procedure, enjoining continued prosecution of the Tort Cases as against the Debtor and ADNY during the pendency of this Bankruptcy Case. The Debtor further seeks a preliminary injunction granting the

same relief for a limited period of one hundred and twenty (120) days while the Mediation Process continues.

75.     The relief requested is necessary to ensure that the purposes of the automatic stay imposed by section 362 of the Bankruptcy Code will not be frustrated by: (a) causing irreparable harm by disrupting the administration and reorganization of the Debtor's estate to the detriment of all creditors; (b) subjecting the Debtor to the risk of collateral estoppel and to a diminution of the Debtor's estate's assets; (c) forcing the Debtor to participate in the Tort Cases if the Court allows the continued prosecution of the Tort Cases; and (d) unnecessarily depleting the assets of the Debtor's estate to the detriment of all victims.  The relief requested will also promote an expedient and equitable resolution of all claims against the Debtor.

### B.      Retention of Bankruptcy Professionals

76.     On or after the Petition Date, the Debtor intends to file applications seeking to retain (i) Klestadt Winters Jureller Southard & Stevens, LLP, as bankruptcy counsel to the Debtor and (ii) John F. Jilleba CPA, PC, as accountants to the Debtor, both subject to Bankruptcy Court approval.

## VII.   Additional Information Required by Local Rule 1007-2(a) and (b)

### A.      Debtor's Business and Events Leading to the Chapter 11 Filing

77.     The information requested in Local Rule 1007-2(a)(1) is set forth in Sections I-III above.

### B.      Bankruptcy Case Was Not Originally Commenced Under Chapter 7

78.     The Bankruptcy Case was voluntarily commenced under Chapter 11 of the Bankruptcy Code.  Accordingly, Local Rule 1007-2(a)(2) is inapplicable.

### C.    No Prepetition Creditors Committee

79.    In accordance with Local Rule 1007-2(a)(3), to the best of the Debtor's knowledge, no pre-petition creditors committee has been formed, though the Debtor is aware of the Ad Hoc Group that is involved in the Mediation Process.

### D.    Holders of the Twenty (20) Largest Unsecured Claims

80.    In accordance with Local Rule 1007-2(a)(4), a list setting forth the top twenty (20) general unsecured creditors of the Debtor, excluding those persons who constitute "insiders" under Bankruptcy Code Section 101(31) of the Debtor is attached as **Exhibit "A"**.  As required by Local Rule 1007-2(a)(4), Exhibit "A" includes the creditors' names, addresses, telephone numbers (for persons familiar with the account, if available), amount of each claim, and an indication of whether the claims are contingent, unliquidated, disputed or partially secured.

### E.    Holders of the Five Largest Secured Claims

81.    As required by Local Rule 1007-2(a)(5), the Debtor has no secured debt.

### F.    Summary of the Debtor's Assets and Liabilities

82.    As required by Local Rule 1007-2(a)(6), a summary of the Debtor's assets and liabilities as of the Petition Date is annexed hereto as **Exhibit "B"**.

### G.    Publicly Held Securities

83.    As required by Local Rule 1007-2(a)(7), the Debtor has no classes of shares of stock, debentures, or other securities of the Debtor that are publicly held.

### H.    Property Held by Others

84.    As required by Local Rule 1007-2(a)(8), to the best of my knowledge, there is no property of the Debtor in the custody of any public officer, receiver, trustee, pledgee, assignee of rents, liquidator, secured creditor or agents of any such person.

### I.      Debtor's Premises

85.      As required by Local Rule 1007-2(a)(9), **Exhibit "C"** contains a list of each of the premises owned, leased or held under any other arrangement from which the Debtor operates.

### J.      Location of the Debtor's Assets and Books and Records

86.      Pursuant to Local Rule 1007-2(a)(10), the majority of the Debtor's hard copy books and records are maintained at the Parish.

### K.      Pending or Threatened Actions Against the Debtor

87.      Pursuant to Local Rule 1007-2(a)(11), **Exhibit "D"** contains a schedule identifying the nature and present status of pending or threatened actions against the Debtor.

### L.      Debtor's Senior Management

88.      In accordance with Local Rule 1007-2(a)(12), **Exhibit "E"** contains a schedule which provides the names of the individuals who constitute the Debtor's senior management, their tenure with the Debtor, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

### M.      Debtor's Employees and Consultants

89.      The Debtor currently has forty-nine (49) employees. As indicated above, each of the Debtor's employees are engaged in either the Debtor's Church Operations or School Operations. To that end, the Debtor has: (i) eleven (11) full time and five (5) part time employees that are engaged in the Debtor's Church Operations, and (ii) twenty-four (24) full time and nine (9) part time employees that are engaged in the Debtor's School Operations. Pursuant to Local Rule 1007-2(b)(1), for the thirty (30) day period following the Petition Date, the Debtor intends to pay employees (exclusive of officers, directors, stockholders, partners, and members) approximately $193,000.

90.     Pursuant to Local Rule 1007-2(b)(2)(A), for the thirty (30) day period following the Petition Date, the Debtor intends to pay insiders approximately $7,000.

### N.     Cash Receipts and Disbursements

91.     Pursuant to Local Rule 1007-2(b)(3), the following provides a schedule of estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue but remain unpaid for the thirty (30) days following the Petition Date:

**Church Operations:**

| Type | Amount |
|---|---|
| Cash Receipts (mass collections, donations, rental income, interest income) | $206,750 |
| Cash Disbursements (salaries and taxes, employee benefits, office and church expenses, insurance) | $184,961 |
| Less Restricted Income | $13,700 |
| Net Cash Gain or Loss | $8,089.00 |

**School Operations:**

| Type | Amount |
|---|---|
| Cash Receipts (tuition) | $250,750.00 |
| Cash Disbursements (salaries and benefits, insurance, maintenance, utilities) | $291,495.00 |
| Net Cash Gain or Loss | ($40,745.00) |

### Conclusion

92.     The Debtor reserves the right to amend or supplement this Declaration and/or any of the schedules annexed hereto as exhibits in the event additional information is obtained by the Debtor during the course of these proceedings.

[Signature Page Follows]

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated:  December 8, 2025

/s/ Theresa Nicholson
Theresa Nicholson

Signature Page to Rule 1007 Declaration

**Exhibit "A"**

**Debtor's Top Twenty Unsecured Creditors**

| Creditor name and name of counsel representing creditor and complete mailing address | Name, telephone number, and email address of creditor contact | Nature of the Claim | Indicate if the claim is contingent, unliquidated, or disputed | Amount of unsecured claim |
|---|---|---|---|---|
| CVA Claimant 1<br><br>Grant & Eisenhofer P.A.<br>485 Lexington Avenue, 29th Floor New York, NY 10017 | Attn: Barbara J. Hart<br>bhart@gelaw.com<br>Tel: (914) 275-5793 | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| CVA Claimant 2<br><br>Grant & Eisenhofer P.A.<br>485 Lexington Avenue, 29th Floor New York, NY 10017 | Attn: Barbara J. Hart<br>bhart@gelaw.com<br>Tel: (914) 275-5793 | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| CVA Claimant 3<br><br>Grant & Eisenhofer P.A.<br>485 Lexington Avenue, 29th Floor New York, NY 10017 | Attn: Barbara J. Hart<br>bhart@gelaw.com<br>Tel: (914) 275-5793 | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |

| Creditor name and name of counsel representing creditor and complete mailing address | Name, telephone number, and email address of creditor contact | Nature of the Claim | Indicate if the claim is contingent, unliquidated, or disputed | Amount of unsecured claim |
|---|---|---|---|---|
| CVA Claimant 4<br><br>Marsh Law Firm PLLC<br>31 Hudson Yards, 11th Floor<br>New York, NY 10001-2170<br><br>Pfau Cochran Vertetis Amala PLLC<br>120 Broadway, 26th Floor<br>New York, NY 10271 | Attn:  James R. Marsh<br>jamesmarsh@marsh.law<br>Jennifer Freeman<br>jenniferfreeman@marsh.law<br>Robert Lewis<br>Robertlewis@marsh.law<br>Tel: (212) 372-3030<br><br><br>Lucas B. Franken<br>lfranken@pcvlaw.com<br>Tel: (212) 300-2444<br>Mallory C. Allen<br>mallen@pcvalaw.com<br>Tel: (646) 480-0848 | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| CVA Claimant 5<br><br>Grant & Eisenhofer P.A.<br>485 Lexington Avenue, 29th Floor<br>New York, NY 10017 | Attn:  Barbara J. Hart<br>bhart@gelaw.com<br>Tel: (914) 275-5793 | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| CVA Claimant 6<br><br>Grant & Eisenhofer P.A.<br>485 Lexington Avenue, 29th Floor<br>New York, NY 10017 | Attn:  Barbara J. Hart<br>bhart@gelaw.com<br>Tel: (914) 275-5793 | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |

| Creditor name and name of counsel representing creditor and complete mailing address | Name, telephone number, and email address of creditor contact | Nature of the Claim | Indicate if the claim is contingent, unliquidated, or disputed | Amount of unsecured claim |
|---|---|---|---|---|
| CVA Claimant 7<br><br>Grant & Eisenhofer P.A.<br>485 Lexington Avenue, 29th Floor New York, NY 10017 | Attn:  Barbara J. Hart<br>bhart@gelaw.com<br>Tel: (914) 275-5793 | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| CVA Claimant 8<br><br>Grant & Eisenhofer P.A.<br>485 Lexington Avenue, 29th Floor New York, NY 10017 | Attn:  Barbara J. Hart<br>bhart@gelaw.com<br>Ken S. Massey<br>kmassey@gelaw.com<br>Samantha Breitner<br>sbreitner@gelaw.com<br>Tel: (646) 722-8500 | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |
| CVA Claimant 9<br><br>Grant & Eisenhofer P.A.<br>485 Lexington Avenue, 29th Floor New York, NY 10017 | Attn:  Barbara J. Hart<br>bhart@gwlaw.com<br>Irene Lax<br>ilax@gelaw.com<br>Samantha Breitner<br>sbreitner@gelaw.com<br>Tel: (646) 722-8500 | Litigation | Contingent, Unliquidated, and Disputed | Undetermined |

## Exhibit "B"

### Summary of the Debtor's Assets and Liabilities

The following are estimates of the Debtor's total assets and liabilities as of October 31, 2025. The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtor. The Debtor reserves all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

**Church Operations:**

| Assets and Liabilities | Amount (Approximate) |
|---|---|
| Total Assets (Book Value) | $6,071,763.55 |
| Total Liabilities (Book Value) | $448,038.66 |

**School Operations:**

| Assets and Liabilities | Amount (Approximate) |
|---|---|
| Total Assets (Book Value) | $2,875,873.21 |
| Total Liabilities (Book Value) | $910,559.12 |

**Exhibit "C"**

**List of Premises**

| Location | Interest | Use |
|---|---|---|
| 8 Carman Road<br>Scarsdale, New York 10583 | Fee Simple Owner | Church |
| 201 Boulevard<br>Scarsdale, New York 10583 | Fee Simple Owner | School |
| 194 Gaylor Road<br>Scarsdale, New York 10583 | Fee Simple Owner | Convent – Leased by Parish to Sisters of Charity for $800 a month |

Exhibit C - 1

## Exhibit "D"

## List of Pending Litigation

| Case Name & Case No. | Status |
|---|---|
| *CVA Claimant 1[7] v. Archdiocese of New York, Immaculate Heart of Mary a/k/a Church of the Immaculate Heart of Mary a/k/a The Parish of the Immaculate Heart of Mary, Iona Preparatory School, and Does 1-5 whose identities are unknown to Plaintiff* | Complaint filed on August 23, 2019 under the CVA. |
| *CVA Claimant 2 v. The Roman Catholic Archdiocese of New York, Church of Immaculate Heart of Mary a/k/a The Parish of the Immaculate Heart of Mary a/k/a Immaculate Heart of Mary School, and Edwin Gaynor* | Complaint filed on January 31, 2020 under the CVA. |
| *CVA Claimant 3 v. The Roman Catholic Archdiocese of New York; Church of Immaculate Heart of Mary a/k/a The Parish of the Immaculate Heart of Mary a/k/a Immaculate Heart of Mary School, Holy Rosary Roman Catholic Church, The Church of St. Bernard and Edwin Gaynor* | Complaint filed on June 24, 2020 under the CVA. |
| *CVA Claimant 4 v. Archdiocese of New York, Immaculate Heart of Mary Church and School, and The Sisters of Charity of Saint Vincent De Paul of New York a/k/a The Sisters of Charity of New York* | Complaint filed on July 14, 2020 under the CVA. |
| *CVA Claimant 5 v. The Roman Catholic Archdiocese of New York, Church of Immaculate Heart of Mary a/k/a The Parish of the Immaculate Heart of Mary a/k/a Immaculate Heart of Mary School, Holy Rosary Roman Catholic Church, The Church of St. Bernard and Edwin Gaynor* | Complaint filed on July 17, 2020 under the CVA. |
| *CVA Claimant 6 v. The Roman Catholic Archdiocese of New York, Church of Immaculate Heart of Mary a/k/a The Parish of the Immaculate Heart of Mary a/k/a Immaculate Heart of Mary School, Holy Rosary Roman Catholic Church, The Church of St. Bernard, The Sisters of Charity of Saint Vincent De Paul of New York a/k/a The Sisters of Charity of New York and Edwin Gaynor* | Complaint filed on August 17, 2020 under the CVA. |

---

[7] For privacy reasons, the Parish has omitted the names of the CVA Claimants and has assigned to each plaintiff a unique identifier (CVA Claimant 1, CVA Claimant 2, etc.).

| Case Name & Case No. | Status |
|---|---|
| *CVA Claimant 7 v. Archdiocese of New York, Church of Immaculate Heart of Mary a/k/a The Parish of the Immaculate Heart of Mary a/k/a Immaculate Heart of Mary School, The Sisters of Charity of Saint Vincent De Paul of New York a/k/a Sisters of Charity of New York, and Edwin Gaynor* | Complaint filed on November 23, 2020 under the CVA. |
| *CVA Claimant 8 v. Archdiocese of New York, Church of Immaculate Heart of Mary a/k/a The Parish of the Immaculate Heart of Mart a/k/a Immaculate Heart of Mary School, The Sisters of Charity of Saint Vincent De Paul of New York a/k/a Sisters of Charity of New York and Edwin Gaynor* | Complaint filed on March 15, 2021 under the CVA |
| *CVA Claimant 9 v. Archdiocese of New York, Church of Immaculate Heart of Mary a/k/a The Parish of the Immaculate Heart of Mary a/k/a Immaculate Heart of Mary School, The Sisters of Charity of Saint Vincent De Paul of New York a/k/a Sisters Charity of New York, Catholic Youth Organization of the Archdiocese of New York, Inc,. and Edwin Gaynor* | Complaint filed on April 21, 2021 under the CVA. |

**Exhibit "E"**

**The Debtor's Senior Management**

| Name/Position | Responsibilities |
|---|---|
| Father Stephen Ries, Pastor (August 2025 to present) | • Oversight and management of all of the buildings and grounds.<br>• Oversight and management of the school and faculty.<br>• Oversight of all parish and school employees, including hiring and firing.<br>• Oversight of all parish finances and fundraising.<br>• Ensuring that the word of God and all the truths of the faith are proclaimed to the people of the Parish through preaching, teaching, and catechesis.<br>• Ensuring that the Eucharist is the center of life in the Parish and making certain that all of the other sacraments are offered and faithfully administered through sound and systematic catechesis, preparation, and instruction.<br>• Getting to know and appreciate the wide diversity, ethnic backgrounds, and cultural perspectives of those under his care, offering the consolation of God's love and supporting family life.<br>• Recognizing and promoting the role of the laypeople and their specific vocation in the Church.<br>• Creating and overseeing the parish consultative bodies and the other organizations and committees. |