**KLESTADT WINTERS JURELLER
SOUTHARD & STEVENS, LLP**
200 West 41st Street, 17th Floor
New York, New York 10036
Telephone: (212) 972-3000
Facsimile: (212) 972-2245
Sean C. Southard
Fred Stevens
Lauren C. Kiss

*Proposed Counsel to the Plaintiff Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | |
| Church of the Immaculate Heart of Mary, | Chapter 11 |
| Debtor. | Case No. 25-23180 (KYP) |
| | |
| Church of the Immaculate Heart of Mary | |
| Plaintiff, | |
| v. | Adversary No. 25-_____ |
| CVA Claimants,[1] | |
| Defendants. | |

**COMPLAINT
SEEKING DECLARATORY AND INJUNCTIVE RELIEF
PURSUANT TO 11 U.S.C. §§ 105 AND 362 AND RULE 7065
OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

---

[1] The Defendants are referred to herein collectively as the "Defendants" or "CVA Claimants" and individually as a "Defendant" or "CVA Claimant" unless greater specificity is required. A full list of the Defendants in this adversary proceeding is included in redacted form in the attached Exhibit A to protect the privacy interests of the abuse victims. An unredacted version of this Complaint and Exhibit A hereto will be served on each Defendant's counsel and an unredacted version will be made available to the Court.

1

The Church of the Immaculate Heart of Mary (the "Debtor" or "Parish"), for its Complaint for Declaratory and Injunctive Relief, states as follows:

## SUMMARY OF THE ACTION

The Debtor seeks (i) a declaratory judgment that the automatic stay provided by 11 U.S.C. § 362(a) (the "Automatic Stay") enjoins, among other things, the continued prosecution of certain lawsuits commenced by the above-captioned Defendants against the Debtor and the Archdiocese of New York ("ADNY") (collectively, the "Tort Cases") and (ii) entry of an order, pursuant to 11 U.S.C. §§ 105(a) and 362(a) and Rule 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), enjoining the CVA Claimants from continuing their prosecution of the Tort Cases against both the Debtor and ADNY. The Debtor seeks to stay or otherwise enjoin the continued prosecution of the Tort Cases to avail itself of the full scope of protection provided by the Automatic Stay, to avoid depletion of estate assets, and to foster an environment in which all parties in interest can engage in meaningful settlement negotiations regarding a consensual resolution to the Tort Cases. Such a resolution will address the Debtor's liabilities to the CVA Claimants and all other similar claimants and, in the Debtor's view, represents the most expedient and effective means of achieving a fair and equitable outcome. Absent an order enjoining the continued prosecution of the Tort Cases, the Debtor, its estate, and creditors will suffer real and substantial harm.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (G) and (O). To the extent the Court may determine that this proceeding is not within its core jurisdiction, the Debtor submits that it is clearly within the Court's "related to" jurisdiction pursuant to 28 U.S.C. § 157(c).

3. The Debtor consents to the entry of a final order or judgment by this Court in connection with this proceeding if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4. Venue of this proceeding in the Southern District of New York is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5. This action is brought in accordance with Rule 7001 of the Bankruptcy Rules. There exists a substantial controversy between the Debtor and the CVA Claimants of sufficient immediacy and reality to warrant the relief requested.

## THE PARTIES

### A. The Debtor

6. On December 8, 2025 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*, the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Court"), commencing the Debtor's chapter 11 case (the "Bankruptcy Case"). The Debtor continues to conduct its ministry and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### B. The CVA Claimants

7. The CVA Claimants, who are defendants in this action, are plaintiffs in their respective Tort Cases.

## FACTUAL BACKGROUND

### C. The Debtor

8. In 1912, thirty-nine (39) Catholic families from Scarsdale petitioned the Archbishop of the Archdiocese of New York to establish a new parish in their village. Their request

3

was granted, and the Debtor was incorporated under the New York Religious Corporation Law on August 5, 1913, with its own corporate structure and governance, distinct from ADNY and from other ADNY-affiliated parishes and schools within ADNY's territory. Under the Religious Corporation Law, the Debtor is governed by five trustees, consisting of two lay trustees, rector of the Debtor, the vicar-general of the Archdiocese of New York, and the archbishop of the Archdiocese of New York.

9. The Debtor's principal place of worship has been located in Scarsdale, Westchester County, since its foundation. For more than a century, the Parish has served its community, and today more than 1,680 families are registered. The Debtor also operates the Immaculate Heart of Mary School, founded on December 11, 1927. In 1972, it became the first lay-administered and lay-staffed school within ADNY's territory. The school currently enrolls approximately 300 students. The Debtor is also active in a range of social ministries, including "Midnight Runs" into Manhattan to provide food and clothing to the homeless, a food pantry, and a "Bread Table" program through which parishioners sell baked goods to support hunger-relief initiatives, among other charitable efforts.

10. The Debtor is served by two (2) priests and religious staff. Father Stephen Ries has served as the Debtor's pastor ("Pastor") since August, 2025. A finance council and a parish council function as consultative bodies that advise and assist the Pastor in matters affecting parish life. Their responsibilities include promoting lay participation, assessing the Debtor's needs and goals, recommending related strategies, and maintaining communication between parish leadership and the broader parish community.

**D.    The Structure of the Catholic Church and ADNY**

11. The Roman Catholic Church is a worldwide community with over 1.2 billion members who adhere to a common creed. The Roman Catholic Church is the one, holy, catholic

and apostolic church of Catholic belief, seated in the Vatican and headed by Pope Leo XIV (the "Catholic Church").

12.     The *Code of Canon Law* establishes the internal organizational structure and procedures to be followed within the Catholic Church. Canon Law was originally codified in 1917 and amended by Pope John Paul II on January 25, 1983. See, 1983 Code of Canon Law c.1-1752 (1983) ("Canon Law"). Canon Law also identifies property rights and agency relationships among the various structures within the community of the Catholic Church.

13.     The Catholic Church is organized by territorial districts, the most common of which is a diocese. A diocese is usually defined by a geographic area and is created to serve the community of Latin Rite Catholics present in that area. The Pope appoints the bishop of each diocese. A parish is a community of the Christian faithful, stably constituted in a particular place of worship, whose pastoral care is entrusted to a priest as its proper pastor under the authority of the diocesan bishop.

14.     ADNY is a nonprofit religious corporation incorporated in 1981 under the laws of the State of New York and an ecclesiastical jurisdiction of the Catholic Church, encompassing the counties of New York, the Bronx, Staten Island, and the counties of Dutchess, Orange, Putnam, Rockland, Sullivan, Ulster, and Westchester to the north of the city, where the Debtor is located. It is the second-largest diocese in the United States by population, comprising approximately 274 parishes and serving roughly 2.8 million Catholics, as well as hundreds of Catholic schools and charitable institutions.

15.     ADNY serves as the ecclesiastical and pastoral authority for the Debtor and for other parishes, schools, charitable organizations, and affiliated Catholic institutions within its territory, and it provides aid and support to these affiliated entities. Although ADNY offers

5

pastoral and administrative assistance, each of these organizations within its territory is a separate religious or not-for-profit corporation with its own property, finances, and governance structure. Parishes and other affiliated entities remain independent from ADNY and are, therefore, independently responsible for their own debts and obligations.

### E. The Tort Cases

16. On February 14, 2019, the State of New York enacted the New York Child Victim's Act which was codified in the New York Civil Practice Law & Rules 214-g (the "CVA"). The CVA created a one-year window, from August 14, 2019 to August 13, 2020, for the revival of previously time-barred civil claims related to childhood sexual abuse; that window was subsequently extended for an additional year through August 13, 2021. Soon thereafter, New York passed the Adult Survivors Act of 2022 ("ASA"), which similarly opened a "revival window" for adult survivors of sexual abuse to file otherwise time-barred claims. Following the implementation of these statutes, more than a thousand of tort-abuse cases were filed by claimants (collectively the "Tort Claimants") against the Debtor, ADNY, and affiliated entities.

17. Prior to the enactment of the CVA and ASA, in 2016, ADNY instituted the Independent Reconciliation and Compensation Program ("IRCP"), as part of its efforts to bring healing and provide compensation to victims. Through the IRCP, which concluded 2017, ADNY resolved claims asserted by approximately 403 individuals, making more than $75 million in total payments.

18. Upon conclusion of the IRCP and other settlement efforts, the Debtor, ADNY, and related non-debtor Catholic entities remain defendants in approximately 1,300 lawsuits, of which nine are the Tort Cases against the Debtor and ADNY as co-defendants which are the subject of this proceeding.

6

19. The Tort Cases center on allegations by the CVA Claimants that the Debtor as well as ADNY are liable for the conduct of certain individuals based on their alleged actions and omissions in connection with employing and/or supervising the alleged perpetrators of abuse. The Tort Cases assert numerous causes of action including, without limitation, claims for negligence, gross negligence, and breaches of fiduciary duties. In *CVA Claimant 5 v. The Roman Catholic Archdiocese of New York, Church of Immaculate Heart of Mary, et al.*, (the "2020 Westchester Case"), trial is currently scheduled to begin on December 9th, 2025, underscoring the urgency of the relief sought in this adversary proceeding.

F. **The Debtor's Insurance Program and the Insurance Litigation**

20. During all time periods relevant to the Tort Cases, ADNY maintained a general liability insurance program (the "Insurance Program") with Indemnity Insurance Company of North America and its successors and affiliated companies (collectively, "Chubb"), which provided insurance coverage for ADNY, the Debtor and other parishes, schools, and Catholic entities within ADNY's geographic territory (the "Insurance Program Participants").

21. During these periods, the Debtor and ADNY maintained primary occurrence-based policies providing coverage for the Debtor and ADNY, up to the applicable per-person and per-occurrence limits. Toward the end of the relevant periods, Chubb also provided excess policies that increased the per-occurrence limits. Pursuant to the Insurance Program, Chubb agreed to pay all defense costs and to indemnify amounts paid in judgments or settlements, in the latter case, up to the limits of available coverage.

22. In its capacity as the administrator of the Insurance Program, ADNY has taken the lead role in defending itself and the Debtor in all Tort Cases and other similar cases, and has coordinated the retention of defense counsel. However, since 2019, Chubb has refused to pay settlements or judgments in connection with such cases. In 2019, ADNY filed suit against Chubb

7

to enforce its insurance rights and sought, among other things, a declaratory judgment confirming that Chubb is obligated, at a minimum, to provide defense coverage to ADNY in connection with these matters. *See The Archdiocese of N.Y. v. Ins. Co. of N. Am., et* al., Supreme Court, New York County, Index No. 653772/2019. That suit was voluntarily discontinued by stipulation of all parties, after Chubb agreed, subject to a reservation of rights, to pay defense costs for tort claims alleging abuse during the relevant policy periods. Notwithstanding their payment of defense costs, Chubb has maintained that it has no duty to indemnify the Insurance Program Participants for any liabilities related to the claims at issue, and has refused to authorize the Insurance Program Participants to accept reasonable settlement demands. ADNY maintains that Chubb's "wait-and-see" strategy and refusal to settle in good faith have unjustifiably delayed the resolution of abuse claims and prioritized the insurer's financial interests over compensation for victims.

23. In June 2023, Chubb filed a declaratory judgment action against the Insurance Program Participants claiming that Chubb has no duty to defend or indemnify the Insurance Program Participants for the underlying tort claims. *See The Archdiocese of N.Y. v. Century Indem. Co. et al.*, Supreme Court, New York County, Index No. 652825/2023 (the "Insurance Litigation").[2] The Insurance Program Participants filed counterclaims for competing declaratory judgments and seeking damages for breach of contract and other counts. At present, the Insurance Litigation has not yet been adjudicated or resolved.

### G. The Restructuring Efforts and The Global Settlement Negotiations

24. The ongoing Tort Cases pose an existential threat to the Debtor's ability to continue its worship and community activities. The Debtor lacks the financial capacity to satisfy potential

---

[2] Given the counterclaims asserted by the Insurance Program Participants, the parties subsequently agreed to restyle the caption to list the Insurance Program Participants as plaintiffs and Chubb as defendant.

judgments, and if forced to remain a defendant in each of the Tort Cases, it will be unable to both compensate all victims equitably and to sustain its mission within the community it serves.

25.     In recent weeks, ADNY has met with an ad hoc group of counsel for more than 80% of plaintiffs asserting tort claims against ADNY and related entities, including the Debtor. Following an initial meeting, the parties agreed to engage Judge Daniel P. Buckley (Ret.) as a neutral mediator for the express purpose of exploring the possibility of a global settlement of all such claims (the "Mediation Process"). While negotiations remain ongoing, the parties have discussed the contours of a global framework, consistent with structures implemented in other diocesan resolutions across the United States. Judge Buckley has an extensive track record of mediating diocesan cases including a successful global resolution of all tort claims affecting the Archdiocese of Los Angeles, California. A global framework of this kind would directly benefit co-defendants of ADNY such as the Debtor.

26.     ADNY had hoped to negotiate and implement a global settlement through the Mediation Process and without judicial involvement, provided that all plaintiffs agreed to a pause of all ongoing litigation. A litigation standstill is essential to achieving a global and uniform resolution that treats all victims fairly and prevents the proverbial "race to the courthouse" among victims to obtain judgments against the respective defendants.

27.     However, one CVA Claimant which is represented by counsel who has participated in the Mediation Process has so far declined to voluntarily pause litigation and instead continues to advance their individual Tort Case. Another Tort Case, the 2020 Westchester Case, is scheduled for trial on December 9, 2025. Litigating the Tort Cases threatens to fracture, if not entirely derail, the Mediation Process, which offers a global, coordinated, and equitable solution for all similarly situated claimants.

9

28. Certain CVA Claimants pursuing continued litigation may have hoped that the burden, cost, and uncertainty of monitoring the Tort Cases, or the prospect of a favorable judgment, would pressure the Debtor or ADNY into providing them with more favorable treatment than what they could equitably expect to receive through the Mediation Process. In reality, the existential threat posed by the Tort Cases left the Debtor with no viable alternative but to file this Chapter 11 Case.

### H.  The Impact of Pending Tort Cases on the Debtor's Restructuring Efforts

29. It is undisputed that the Tort Cases cannot proceed against the Debtor following the imposition of the automatic stay. The Debtor is nevertheless concerned that certain CVA Claimants may attempt to circumvent the automatic stay by severing the Debtor from those actions and therefore continue prosecuting the Tort Cases solely against ADNY. As set forth more fully herein and in the Debtor's motion for a preliminary injunction, such a course would have an immediate adverse economic impact on the Debtor and impair its restructuring efforts.

30. Continuing the Tort Cases during the pendency of this Bankruptcy Case will be burdensome to both the Debtor and ADNY and will disrupt the administration and expeditious reorganization of the Debtor's estate to the detriment of all creditors. Allowing the CVA Claimants to proceed will also permit them to obtain an unfair advantage over all other similarly situated survivors of abuse. Inevitably, the Debtor and ADNY will be required to expend significant time and money in responding to the Tort Cases, dissipating the assets of the Debtor's estate to the detriment of all creditors.[3] Moreover, litigating the Tort Cases is inconsistent with and threatens

---

[3] While Chubb is providing defense costs, those payments are (1) subject to Chubb's reservation of rights and its claim for recoupment/clawback in the Insurance Litigation, and (2) constitute property of the Debtor's estate as insurance proceeds.

10

the Mediation Process, which, though led by ADNY, offers the Debtor a meaningful opportunity to resolve its own tort liabilities.

31.  As noted, the Debtor, ADNY and other affiliated entities are engaged in coordinated restructuring efforts through the Mediation Process, which is intended to achieve a global settlement funded by contributions from ADNY, the Debtor and other affiliates. Allowing the Tort Cases to proceed against ADNY would risk diminishing ADNY's financial capacity to contribute to a settlement, thereby reducing the likelihood of a successful global settlement that would address the Debtor's own tort liabilities. In other words, proceeding against ADNY will consume resources that would otherwise be available for a global settlement, to the detriment of the Debtor, as well as all tort victims and parties in interest.

32.  Moreover, any Tort Case successfully prosecuted against ADNY would likely result in CVA Claimants seeking to satisfy a judgment through shared insurance proceeds. Any use of shared insurance to satisfy such a judgment would deplete—dollar for dollar—proceeds that would otherwise be available to the Debtor to address its own liability for the same claims. Given the finite reserves and policy limits under the Insurance Program, the total insurance coverage available to ADNY and the other participating entities, including the Debtor, is limited. Accordingly, continuation of the Tort Cases as to any Insurance Program Participant will have an immediate adverse economic effect on the Debtor's estate.

33.  Additionally, if the Tort Cases continue solely against ADNY, the Debtor will nonetheless be required to monitor and participate because the claims asserted against ADNY are the same claims asserted against the Debtor. The Debtor may be exposed to contribution liability, collateral estoppel, adverse precedent, vicarious liability, or imputed admissions if the litigation proceeds. In that event, the Debtor will have no choice but to participate in the Tort Cases,

11

diverting substantial resources away from its Chapter 11 process and undermining the effectiveness of the automatic stay.

34. The Debtor intends to pursue a restructuring that is closely coordinated with the broader resolution pursued through the Mediation Process.

35. This adversary proceeding is brought to stay or otherwise enjoin the continued prosecution of the Tort Cases, including the 2020 Westchester Case scheduled for trial on December 9, 2025. In particular, the Debtor seeks a declaratory judgment, pursuant to sections 105(a) and 362(a) of the Bankruptcy Code, that the automatic stay enjoins any further prosecution of the Tort Cases at least until the effective date of a confirmed plan of reorganization for the Debtor.

36. In the alternative, the Debtor also seeks injunctive relief pursuant to sections 105(a) and 362 of the Bankruptcy Code and Rule 7065 of the Federal Rules of Bankruptcy Procedure, enjoining continued prosecution of the Tort Cases as against the Debtor and ADNY for one hundred and twenty (120) days while the Mediation Process continues.

37. The relief requested is necessary to ensure that the purposes of the automatic stay imposed by section 362 of the Bankruptcy Code will not be frustrated by: (a) causing irreparable harm by disrupting the administration and reorganization of the Debtor's estate to the detriment of all creditors; (b) subjecting the Debtor to the risk of collateral estoppel and to a diminution of the Debtor's estate's assets; (c) forcing the Debtor to participate in the Tort Cases if the Court allows the continued prosecution of the Tort Cases; and (e) unnecessarily depleting the assets of the Debtor's estate to the detriment of all victims. The relief requested will also promote an expedient and equitable resolution of all claims against the Debtor.

## Count I

### Confirming the Applicability of The Automatic Stay
### (Declaratory Relief)

38. The Debtor repeats and realleges each allegation set forth in paragraphs 1 through 37 of this Complaint as if fully set forth at length herein.

39. Section 362(a)(1) of the Bankruptcy Code prohibits the commencement or continuation of any action against a debtor that was or could have been commenced prior to the bankruptcy filing, or that seeks to recover on any claim that arose prior to the commencement of the bankruptcy case. Because the Debtor and ADNY are co-defendants in the Tort Cases, the continuation of those actions must be stayed under section 362(a)(1).

40. Section 362(a)(3) of the Bankruptcy Code prohibits the commencement or continuation of any act, whether directed at the debtor or a third party, to obtain possession of, or to exercise control over, property of the debtor's estate. In addition, this Court has authority under 11 U.S.C. § 105(a) to issue any order, process, or judgment necessary or appropriate to carry out the provisions of the Bankruptcy Code.

41. Continued prosecution of the Tort Cases will cause irreparable harm to the Debtor's ability to reorganize. This is true whether the Tort Cases proceed against both the Debtor and ADNY or solely against ADNY, because: (1) such litigation will consume ADNY's resources that are needed to fund a global settlement benefitting the Debtor; (2) it will deplete insurance assets of the Debtor's estate through defense costs, and losses incurred by ADNY; (3) the nature of the factual allegations and claims in the Tort Cases exposes the Debtor to potential indemnification obligations, vicarious liability, adverse precedent, collateral estoppel, and imputed admissions; (4) ADNY may assert contribution or indemnification claims against the Debtor, and

the Debtor may be required to indemnify ADNY; and (5) continued prosecution of the Tort Cases may have the effect of favoring the CVA Claimants over other victims.

42. A substantial and immediate controversy exists between the Debtor and the CVA Claimants sufficient to warrant issuance of a declaratory judgment under 28 U.S.C. § 2201. Prompt judicial determination of the parties' respective rights and obligations is necessary and appropriate.

## Count II

### Enjoining the Tort Cases Pursuant to 11 U.S.C. § 105(a) and Rule 7065 of the Federal Rules of Bankruptcy Procedure

**(Injunctive Relief)**

43. The Debtor repeats and realleges each allegation set forth in paragraphs 1 through 42 of this Complaint as if fully set forth at length herein.

44. The Court has the power to the stay the Tort Cases under section 105(a) of the Bankruptcy Code which provides, in relevant part, that the Court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The authority granted by section 105(a) of the Bankruptcy Code permits bankruptcy courts to issue injunctive relief where parties are pursuing actions pending in other courts that threaten the integrity of a debtor's estate.

45. Courts construe section 105(a) liberally to enjoin suits that might impede the reorganization process, without necessarily requiring proof of all four factors normally required for preliminary injunctions under Rule 65 of the Federal Rules of Civil Procedure (made applicable herein by Rule 7065 of the Federal Rules of Bankruptcy Procedure). Nonetheless, entry of a preliminary injunction enjoining prosecution of the Tort Cases against the Debtor and ADNY is warranted even under the traditional four-factor test:

(1)     The Debtor is likely to succeed on the merits. Bankruptcy courts interpret this factor to mean a likelihood of a successful reorganization. Here, given the stage of ongoing negotiations toward a global settlement, the Debtor is likely to achieve such a reorganization.

(2)     The Debtor will suffer irreparable injury absent an injunction. Continuation of the Tort Cases poses an immediate threat of adverse economic impact on the Debtor's estate, interference with the Debtor's ability to reorganize, and the harms detailed above, including depletion of resources and exposure to indemnification and liability risks.

(3)     The balance of harms favors issuance of the injunction. Allowing CVA Claimants to dissipate estate assets or recover against estate property outside a court-supervised reorganization would undermine the Bankruptcy Code's core policy of equal treatment among similarly situated creditors. As discussed, the Debtor will suffer immediate and substantial harm to its reorganization prospects and to the value of its estate should the Tort Cases proceed during the Bankruptcy Case. By contrast, the CVA Claimants will suffer little, if any, harm from an injunction. Their claims are preserved, and the injunction merely postpones prosecution before the State Court for only one hundred and twenty (120) days while the global settlement negotiations continue.

(4)     Issuance of the injunction serves the public interest. A stay or injunction halting continued prosecution of the Tort Cases promotes centralized resolution of all creditor claims, facilitates the Debtor's successful reorganization, and expedites administration of its estate. It allows the Debtor to maximize estate value for all creditors and ensures distribution in accordance with the Bankruptcy Code, while also providing a pathway to

15

address the claims of the CVA Claimants and other abuse survivors through a global resolution.

46. Absent immediate injunctive relief staying the Tort Cases as against the Debtor and ADNY, the Debtor's estate and its creditors will suffer irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, the Debtor respectfully prays for judgment as follows:

a. for a declaration that the Tort Cases against the Debtor and ADNY are stayed pursuant to section 362(a) of the Bankruptcy Code through and including effective date of a confirmed plan of reorganization for the Debtor; or

b. an injunction pursuant to sections 105(a) and 362(a) and Bankruptcy Rule 7065 of the Bankruptcy Code barring the continued prosecution of the Tort Cases, or the commencement of any action or proceeding of any nature whatsoever by the CVA Claimants based on allegations substantially similar to any set forth in the Tort Cases, as against the Debtor and ADNY through and including effective date of a confirmed plan of reorganization for the Debtor; and

c. a preliminary injunction pursuant to sections 105(a) of the Bankruptcy Code and Bankruptcy Rule 7065 barring the continued prosecution of the Tort Cases, or the commencement of any action or proceeding of any nature whatsoever by the CVA Claimants based on allegations substantially similar to those set forth in the Tort Cases, as against the Debtor and ADNY for one hundred and twenty (120) days while the Mediation Process continues;

d. for such other and further legal and equitable relief as this Court deems just and proper.

16

Dated:   New York, New York
        December 8, 2025

**KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP**

By: */s/ Sean C. Southard*
    Sean C. Southard
    Fred Stevens
    Lauren C. Kiss
    200 West 41st Street, 17th Floor
    New York, New York 10036
    Tel: (212) 972-3000
    Fax: (212) 972-2245
    Email: ssouthard@klestadt.com
           fstevens@klestadt.com
           lkiss@klestadt.com

*Proposed Counsel to the Plaintiff Debtor and Debtor-in-Possession*

# Exhibit A

- *CVA Claimant 1 v. Archdiocese of New York, Immaculate Heart of Mary a/k/a Church of the Immaculate Heart of Mary a/k/a The Parish of the Immaculate Heart of Mary, Iona Preparatory School, and Does 1-5 whose identities are unknown to Plaintiff*

- *CVA Claimant 2 v. The Roman Catholic Archdiocese of New York, Church of Immaculate Heart of Mary a/k/a The Parish of the Immaculate Heart of Mary a/k/a Immaculate Heart of Mary School, and Edwin Gaynor*

- *CVA Claimant 3 v. The Roman Catholic Archdiocese of New York; Church of Immaculate Heart of Mary a/k/a The Parish of the Immaculate Heart of Mary a/k/a Immaculate Heart of Mary School, Holy Rosary Roman Catholic Church, The Church of St. Bernard and Edwin Gaynor*

- *CVA Claimant 4 v. Archdiocese of New York, Immaculate Heart of Mary Church and School, and The Sisters of Charity of Saint Vincent De Paul of New York a/k/a The Sisters of Charity of New York*

- *CVA Claimant 5 v. The Roman Catholic Archdiocese of New York, Church of Immaculate Heart of Mary a/k/a The Parish of the Immaculate Heart of Mary a/k/a Immaculate Heart of Mary School, Holy Rosary Roman Catholic Church, The Church of St. Bernard and Edwin Gaynor*

- *CVA Claimant 6 v. The Roman Catholic Archdiocese of New York, Church of Immaculate Heart of Mary a/k/a The Parish of the Immaculate Heart of Mary a/k/a Immaculate Heart of Mary School, Holy Rosary Roman Catholic Church, The Church of St. Bernard, The Sisters of Charity of Saint Vincent De Paul of New York a/k/a The Sisters of Charity of New York and Edwin Gaynor*

- *CVA Claimant 7 v. Archdiocese of New York, Church of Immaculate Heart of Mary a/k/a The Parish of the Immaculate Heart of Mary a/k/a Immaculate Heart of Mary School, The Sisters of Charity of Saint Vincent De Paul of New York a/k/a Sisters of Charity of New York, and Edwin Gaynor*

- *CVA Claimant 8 v. Archdiocese of New York, Church of Immaculate Heart of Mary a/k/a The Parish of the Immaculate Heart of Mart a/k/a Immaculate Heart of Mary School, The Sisters of Charity of Saint Vincent De Paul of New York a/k/a Sisters of Charity of New York and Edwin Gaynor*

- *CVA Claimant 9 v. Archdiocese of New York, Church of Immaculate Heart of Mary a/k/a The Parish of the Immaculate Heart of Mary a/k/a Immaculate Heart of Mary School, The Sisters of Charity of Saint Vincent De Paul of New York a/k/a Sisters Charity of New York, Catholic Youth Organization of the Archdiocese of New York, Inc., and Edwin Gaynor*

Exhibit A-1